IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| REDONDO CONSTRUCTION CORPORATION, | : | Case No. 02-02887 (GAC) |
| | : | |
| Debtor | : | Chapter 11 |
| _____ | : | |
| | : | |
| REDONDO CONSTRUCTION CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. No. 03-0192 |
| | : | Adv. No. 03-0194 |
| PUERTO RICO HIGHWAY AND | : | Adv. No. 03-0195 |
| TRANSPORTATION AUTHORITY, | : | |
| | : | |
| Defendant | : | |
| _____ | : | |

DECISION AND ORDER

On March 19, 2002, Redondo Construction Corporation ("RCC") filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On December 23, 2003, RCC filed three complaints against the Puerto Rico Highway Authority ("PRHA"), claiming amounts due for construction work performed in three projects: AC-005317 ("Desvío Sur de Patillas"), Adversary No. 03-0192; AC-20009 ("PR 2 Mayagüez"), Adversary No. 03-0194; and AC-01657 ("Dorado-Toa Alta"), Adversary No. 03-0195. On October 5, 2005, the Court confirmed RCC's plan of reorganization, as amended. (Docket No. 1207).

After significant discovery by the parties, the trial on these adversaries was held on February 12-16, 26-28, and July 2 and 6,

2007.  During the trial, RCC offered extensive documentary evidence and the testimony of Arq. Miguel Redondo, Engs. Rodolfo Montero, Raúl Bras, Angel Mercado, Humberto Reynolds, Luis García, Mr. Andrew Civitello, and Rafael Pérez-Villarini, CPA.

PRHA had announced Dr. Sergio González, Engs. Fabián Delgado, Víctor Pérez, Gonzalo Aponte, José Borges, and Messrs. Rubén del Valle, Frank López, and Carlos Alamo, as its witnesses. (Pre-trial Reports) (RCC's EX 63[1]) (Tr. of 2/27/07, pp. 1523-1530) (Docket No. 109). Thereafter, PRHA informed that Dr. González was not going to be used as a witness and consequently, RCC offered into evidence certain portions of Dr. González's deposition.   During the hearing of February 16, 2007, PRHA indicated that it would use all of its witnesses and the case was scheduled to include July 2, 3, 6,  and 9, and if  necessary, July 10, 2007.  (Tr. of 2/16/07, pp. 1069-1079 ).

On February 28, 2007, PRHA offered the testimony of Eng. Delgado.  However, on July 2, 2007, PRHA announced that of the six remaining witnesses, it was only going to use two, Engs. Pérez and Aponte (Tr. of 7/2/07, pp. 93-94), and Miguel Díaz ("Díaz"), announced by RCC as its witness, renounced as cumulative evidence, and made available to PRHA.  Eng. Pérez testified on July 2, 2007.  However, on July 6, 2007, PRHA announced that it was not going to use Eng. Aponte either and submitted its case.

Since RCC had deposed the witnesses renounced by PRHA, during

---

[1] Pertains to the PR-2 Mayagüez project.

2

the hearing of July 6, 2007, RCC, without opposition from PRHA, offered in evidence part of the transcripts of the following depositions, admitted as RCC's exhibits: Mr. Alamo's (RCC's EX 62), Mr. López' (RCC's EX 66), and Eng. Del Valle's (RCC's EX 67).[2]

At the conclusion of the trial, the Court directed the parties to file simultaneous post-trial memoranda by August 31, 2007, which was subsequently extended until November 9, 2007.

BACKGROUND

**The Contracts**

RCC is a corporation organized and authorized to do business in accordance with the laws of the Commonwealth of Puerto Rico. (Pretrial Report, Stipulated Facts).  PRHA is a body, politic and corporate, duly established and existing under the laws of the Commonwealth of Puerto Rico.  (Pretrial Report, Stipulated Facts).

On April 18, 1990, PRHA entered into a contract with RCC as to the PR-2, Mayagüez project (Federal Aid Project No. HES-2-5(17)), consisting of improvements and additional lanes at Road PR-2 from Mayagüez Terrace to PR-10.  (Pretrial Report, Stipulated Facts; Joint EXs 1, 2, 3, 7, 53 [3]; RCC's EX 8) (Tr. of 2/12/07, pp. 93-95, 102-103, 105, 110-113).

On August 30, 1991, PRHA entered into a second contract with RCC as to the Desvío Sur de Patillas project (Federal Aid Project PR-53

---

[2] Exs 62, 66 and 67 pertain to the PR-2 Mayagüez project.

[3]  Joint EX 53 is common to the 3 projects.

Fed. F-53-1).  (Pretrial Report, Stipulated Facts).  This project consisted mainly of a large bridge crossing the Patillas River, with an approach road.  It required pile driving to support the bridge bed and lasted about three years.  The original contract price was $8,729,000.00, with an original 540-day term and was substantially completed on March 18, 1994.  (Pretrial Report)(Joint EX 1; RCC's EXs 3, 4, 5, 6 and 9 [4]) (Tr. of 2/12/07, pp. 18, 20, 33, 63-64; Tr. of 2/26/07, pp. 715-716, 725-728, 731-735, 743).

On June 7, 1993, PRHA awarded RCC a third contract, the Dorado-Toa Alta project, consisting of the replacement of a bridge and access roads between Dorado and Toa Alta, Puerto Rico, for $2,657,000.00, known as Construction of Federal Aid Project BR-2165 (12), Replacement of Bridge No. 365, Highway PR 165R, Municipalities of Dorado and Toa Alta, PR, also with a 540-day term.  (Pretrial Report, Stipulated Facts).  This project was completed on September 5, 2005.  (Joint EX 1; RCC's EXs 11, 12, 13, 14[5])(Tr. of 2/12/07, pp. 19-20, 45).

The plans and specifications for all three projects were prepared by PRHA.  (Tr. 2/12/07, pp. 50-51).  The three were unit-price projects and had federal funds participation.  (Tr. of 2/12/07, pp. 45-46, 139-141; Tr. of /15/06, pp. 801-802, 878-882).

The master contract for each of the three projects is contained in a contract book that incorporates the award, the bid documents, the

---

[4] Exhibits pertain to the Desvío Sur de Patillas project.

[5] Exhibits pertain to the Dorado-Toa Alta project.

plans and specifications and general provisions, as an integral part

thereof. It also incorporates the Commonwealth of Puerto Rico

Department of Transportation and Public Works and Highway Authority's

"Standard Specifications for Road and Bridge Construction of 1989,"

known as the "Blue Book." (Pretrial Reports, Stipulated Facts; Joint EXs

1 and 53 as to the 3 projects)(Tr. of 2/12/07, pp. 45, 102-103, 105, 109,

111-113, 117-121).

**Blue Book Provisions**

The pertinent parts of the Blue Book are as follows:

Section 104 of the Blue Book titled <u>Scope of Work</u> provides as to

the intent of the contract and the alterations of plans or character of

the proposed work:

104.01  Intent of Contract — The intent of the Contract is to provide for the construction and completion in every detail of the work described. The Contractor shall furnish all labor, materials, equipment, tools, transportation and supplies required to complete the work in accordance with the plans, specifications and terms of the contract.

104.02  Alteration of Plans or Character of Proposed Work —

a.   The Authority reserves the right to make, at any time during the progress of the work, such increases or decreases in quantities and such alterations in the work as necessary to satisfactorily complete the project. Such increases or decreases and alterations shall not invalidate the contract nor release the Surety, and the Contractor agrees to perform the work as altered.

b.  Unless such alterations and increases or decreases materially change the character of the work to be performed or the costs thereof, the altered work shall be paid for at the same unit prices as other parts of the work. If, however, the magnitude of the alterations is such as to alter the scope of work specified in the contract by materially changing either the character or the unit costs of the work under the contract, whether or not changed by any such

alteration, an adjustment will be made to the contract.  The basis for the adjustment shall be agreed upon prior to the performance of the work; if a basis cannot be agreed upon, then the Authority reserves the right to require the Contractor to perform the work by force account as per Article 109.04, to eliminate the increased quantity from the contract, or to perform the work in other manner.

c.   If the altered or added work is of sufficient magnitude to require additional time in which to complete the project, such time adjustments may be made in accordance with the provisions of Article 108.08.

As to the increased or decreased quantities of the work performed under the contracts, Section 104.03 of the Blue Book recognizes that the quantities in the proposal schedule are approximate only and the actual quantities to be paid for are to be determined when the work is performed and accepted.  Increases or decreases in the proposed scheduled quantities, other than as provided under Section 104.02(b) (see above), will be considered as normal overruns or underruns, and the Contractor shall accept as payment in full, so far as contract items are concerned, payment at the original contract unit prices for the accepted quantities of work performed.

With respect to differing site conditions, the Blue Book at Section 104.05(a), provides that should the Contractor encounter during the progress of the work subsurface or latent physical conditions at the site differing materially from those indicated in the contract or unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work of the character provided for in the contract, the Contractor shall promptly notify the [Resident] Engineer in writing of the specific differing conditions before they are disturbed or the

6

affected work is performed.  Upon written notification, the [Resident] Engineer will promptly investigate the conditions, and if the [Resident] Engineer determines that they do materially differ and cause an increase or decrease in the cost of, or the time required for the performance of any part of the work under the contract, whether or not changed as a result of the conditions, an equitable adjustment will be made and the contract modified in writing accordingly.

Paragraph (b) of Section 104.5 provides that no contract adjustment for the benefit of the Contractor shall be allowed unless the Contractor has given the written notice required.

The probabilities of differing site conditions is recognized in Section 105.02(b) of the Blue Book, when it states:

> The detail plans and specifications for the contract have been prepared with care and are intended to show as clearly as is practicable the work required to be done.  The Contractor must realize, however, that construction details cannot always be accurately anticipated and that in executing the work, field conditions may require reasonable modifications in the details of plans and quantities of work involved.  Work under all the items in the contract must be carried out to meet these field conditions to the satisfaction of the [Resident] Engineer and in accordance with his instructions and the contract specifications.

As to extra work, Section 104.06(a) and (b) of the Blue Book specifies that the Contractor shall perform unforeseen work, for which there is no price included in the contract, whenever it is deemed necessary or desirable by the [Resident] Engineer, in accordance with the applicable specifications, standard plans, the contract documents, and as directed by the [Resident] Engineer, and that payment for such

extra work shall be at the prices agreed upon between the Authority and the Contractor as specified in the approved extra work order.

Under the contracts and as stated in Section 104.06(c), if an agreement on the prices for the extra work could not be reached, PRHA could order in writing RCC to perform the required work on a force account basis and RCC was then to execute the order.  Payment for such force account work is specified in Section 109.04.   PRHA could also elect to have such work performed by the Commonwealth forces or by separate contract.

Section 105.17(a) and (b) of the Blue Book provides:

a.   When the Contractor deems that extra compensation is due him for work or materials not clearly covered in the contract or not ordered by the [Resident] Engineer as extra work, as defined herein, the Contractor shall notify the [Resident] Engineer in writing of his intention to make claim for such extra compensation within one working day after he begins the work on which he bases the claim.  If such notification is not given, and the [Resident] Engineer is not afforded proper facilities by the Contractor for keeping strict account of actual cost as required, then the Contractor hereby agrees to waive any claim for such extra compensation.  Such notice by the Contractor, and the fact that the [Resident] Engineer has kept account of the cost as aforesaid, shall not in any way be construed as proving or substantiating the validity of the claim.

b. If the claim, after consideration of the [Resident] Engineer, is found to be just, it will be paid as extra work as provided in Article 104.06.

The Blue Book, in Section 108.08(a) and (b) addresses the determination and extension of the contract time by stating that the contract time will be the number of days allowed for completion of the work as stated in the proposal and in the contract, and shall commence on the date stipulated in the notice to proceed.  When the contract time

8

is a calendar day basis, every calendar day after the date of commencement will be counted until the project is substantially completed.

Section 108.08(e) states that the determination of whether a project is substantially completed is at the discretion of PRHA and that a project will normally be considered substantially completed when all the contract work, except for a few minor details, has been completed, the required final cleaning-up has been performed, and the project can be fully and safely opened to traffic or used for the intended use.

Then, Section 108.08(f) provides for the extension of the time for the performance of the contract work for reasons that include (1) when the satisfactory fulfillment of the contract requires performance of work in greater quantities than those set forth in the proposal, by increasing the performance on a basis commensurate with the amount, cost and difficulty of the added work; (2) if at the time a change order or an extra work order is executed, a time extension is agreed upon and so stipulated in the written order or supplemental agreement, in which case the added cost of such work will not be considered for time extension. If no time extension is stated, any added cost resulting therefrom is to be considered for time extension as provided for in Section 108.08(f); and (3) causes beyond the control of the Contractor, including causes not attributable thereto.

A particular provision of the Blue Book is Section 206-3.05 titled <u>Cofferdams and Sheet Piling</u>, specifying that suitable and practically watertight cofferdams are to be used whenever water-bearing strata are

encountered above the elevation of the bottom of the excavation.  Then Section 206-3.05 goes into the specifications for the construction of cofferdams, followed by RCC in the Dorado-Toa Alta project.

In turn, Section 206-4.04 specifies that the concrete for foundation seals is to be measured in specification 601, structural concrete, also followed by RCC in the Dorado-Toa Alta project, who is entitled to be paid for the concrete used in the cofferdam in accordance to Section 601-4 of the Blue Book.

### DISCUSSION

Due to the problems encountered by RCC in the three projects, RCC was given extra time by PRHA to complete the same, but was not compensated financially for the costs incurred thereby due to inefficiency and extended overhead, resulting from the required extensions of time to complete the jobs due to delays and differing site conditions.  (Tr. of 2/12/07, pp. 76-77, 135-136; Tr. of 2/14/07, pp. 557-559).

But, by the granting of extra time, it was obvious that RCC's overhead would increase, since RCC had to keep engineers at the project, as well as other personnel and equipment, and had to incur all the fixed expenses, aside from the consequent increase in the main office overhead.  When RCC submitted its proposals or bids for the projects, it did so on the basis of the contract time indicated by PRHA, 540 days in all three cases.  In demanding that RCC continue working without being paid for the increase in overhead, due to the policy of PRHA's Executive Director, Dr. González, that overhead would be dealt with at

10

the end of the contracts, PRHA did not act in accordance thereto and caused RCC's resources to be depleted. (Tr. of 2/12/07, pp. 135-136).

For the quantification of its claim for overhead on the three projects, RCC used the Eichlay Formula. (Tr. of 2/12/07, pp. 70-75, 152).

The problems encountered by RCC in the three projects were brought to the attention of PRHA as the construction work went along. Every time, a differing site condition arose, PRHA was informed through its resident engineers, who being at the projects, were aware of them. (Tr. of 2/12/06, p. 125; Tr. of 2/14/07, pp. 565, 638-640).

After the trial of these matters was held, in their post-trial briefs, PRHA spent considerable time arguing that these matters are non-core proceedings and that it does not consent to the entry of any final orders or judgments by this Court. Notwithstanding, this Court concludes that at a hearing, held on November 18, 2003, PRHA specifically agreed to submit these matters to the bankruptcy court in lieu of the arbitration proceedings provided for in the contracts (dkt. #649 in the legal case). Accordingly, the Court concludes that as proceedings related to RCC's bankruptcy case and based on PRHA's explicit consent, the Court has jurisdiction to enter final orders and judgments in these proceedings.

### AC-005317 ("Desvío Sur de Patillas"), Adversary No. 03-0192

This project consisted of the construction of 1.79 kilometers of paved road, two lanes, 3.65 meters wide, an emergency lane three meters wide, drains, lighting, signs, markers, a prefabricated

concrete beam of 13.30 meters wide and 1,219 meters long and other miscellaneous work with a contract term of 540 calendar days, at an original cost of $8,729,000.00.  Some of the problems experienced by RCC at the project consisted of an "under-run" in the installation of piles, with the surveying, the elevations of the decks, and design problems, such as the diaphragms and the beams.  (RCC's Ex 2, Tr. 2/15/07, pp. 738-742).  The design problems were:

a.  Discrepancies in vertical and horizontal control points.

b.  Change of axis in the batter piles.

c.  Modification in the quantity of the rebar in the footings.

d.  Vertical and horizontal axis alignment in the west access.

e.  Modification on diaphragm width with respect to plan detail.

f.  Location of wing wall piles.

g.  Relocation of pump house.

h.  Geometric improvements to the west access.

I.  Backwall abutment elevation #1 and #2.

j.  Width of OG bearing wall abutments.

k.  Width of bridge overhand.

l.  Modification of rings in diaphragm.

m.  Addition of deck drains.

n.  Width of ramp and earthwork on west access.

o.  Modification in width of pavement lines.

p.  Geometric improvements in east intersection.

q.  Improvements in project signs.

12

r. Over width construction in east access.

s. Modification on bridge profile.

t. Wetland restoration.

u. Property line points on south side fence.

(RCC's Exhibit 11).

At the trial of this matter, Arq. Miguel Redondo testified as to the Desvío Sur de Patillas project and the Dorado-Toa Alta projects. At the time of the Desvío Sur de Patillas project, Arq. Redondo was RCC's executive vice-president in charge of all field operations, including that project, as to which Eng. Reynolds was the project manager. (Tr. of 2/27/07, p. 1445). Arq. Redondo testified that the Patillas project had a lot of defects as to the plans and specifications, as summarized in the attachments to Exhibit 11, which reflect the problems encountered by RCC, resulting in twenty-two extra work and fifteen change orders. (Tr. of 2/27/07, pp. 1446-1448).

Eng. Reynolds also testified as to the Desvío Sur de Patillas project. He reiterated the problems that affected the progress of the work, *i.e.,* under-run on the piles for the construction of the bridge, modifications of design and to the structure itself, which delayed the project. The under-run on the piles was due to the actual conditions found when driving them, which resulted in a reduction in their driving length. (Tr. of 2/26/07, pp. 1099-1100). RCC became aware of this factor during the construction of the

project. The situation lasted throughout the installation of the piles and was subject to final liquidation by PRHA. The final assessment as to its impact had to be done when the activity was finished. (Tr. of 2/26/07, pp. 1100; 1102; 1151-1152).

These problems affected the progress of the construction, causing a loss of productivity and inefficiency in the work that had been planned. They delayed the work and increased the construction costs. (Tr. of 2/15/07, pp. 742-743). The estimate of the quantities as to the piles shown in the contract were more than those for the actual construction, causing under-runs. (Tr. of 2/15/07, pp. 738-739).

The project design included the installation of steel piles manufactured in the United States on what is called a "mill length" of 90 feet. For a 90-feet pile, a 40-feet and 50-feet pile would be ordered, which required the use of a splice to weld the two pieces together. A steel point would also be ordered to protect the end of the pile during the installation. In preparation for the submission of the bid for costs purposes, RCC considered the information provided in the drawings by PRHA and made a calculation as to how many steel points and splices would be needed based on the number of piles and mill length. (Tr. of 2/15/07, pp. 744-746).

After that, a fixed cost was applied to the units specified in the contract and distributed along the linear meters of the piles as to the steel points and splices. However, when the pile to be driven

14

90 feet, the full length, goes into the ground only 60 feet, there is an under-run, and the contractor does not recover the fixed cost of the steel point and the splice on that pile, since what PRHA pays is the linear feet of the pile driven into the ground.  (Tr. of 2/15/07, pp. 746-752).

This under-run of the piles, which is the foundation where the piers or columns of the bridge shown in Exhibit 6 sits, happened in the Desvío Sur de Patillas project as to all the piles.  (Tr. of 2/15/07, pp. 752-753).  RCC identified the situation and requested compensation for the cost caused by the under-run (Tr. of 2/15/07, pp. 754-755).  On October 19, 1994, making reference to previous correspondence, RCC submitted a revised claim to PRHA for $34,072.27 for the unrecovered expense during the driving of the piles (Ex 10; Tr. 2/15/07, pp. 784-785).

As argued by PRHTA, the Court accepts that other courts have consistently held that the differing site condition clause applies only to conditions that already existed at the time of contracting. *See*, Olympus Corp. v. US, 98 F. 3d 1314 (Fed. Cir. 1996) (holding that a contractor was not entitled to an equitable adjustment for a differing site conditions claim based on an event that occurred after the contract was executed).  And the Court concludes that RCC's claim based on differing site conditions was due to conditions that varied materially from those indicated in the contract documents, that the conditions were physical and that they clearly existed prior to

15

contract formation.  RCC reasonably relied on the contract prepared by PRHTA.

On February 21, 1995, RCC submitted its final claim, including the under-run on the piles and the additional expenses incurred in the construction of the Patillas project, resulting from the alterations and modifications suffered thereby, which seriously affected the original term of the contract, causing extraordinary delays, and RCC's direct administrative costs, as evidenced by the fifteen change orders and the twenty-two extra work orders, which caused an extended period of time to complete the job.  RCC claims:

| | | |
|---|---|---|
| 1. | Office overhead | $ 335,770.89 |
| 2. | Credit office overhead | ($ 81,218.53) |
| 3. | Job overhead | $ 359,864.49 |
| 4. | Under-run piles/joints | $  34,072.27 |
| | Total Cost | $ 648,489.12 |
| | 10% Profit | $  64,848.91 |
| | Total | $ 713,338.03 |

Interest would also have to be added to the claim at 6.5% as of February 27, 2007.  (Joint Ex 12; RCC Ex 11; Tr. of 2/15/07, pp. 758-762; Tr. of 2/27/05, pp. 1448-1450; 1457-1458).

Generally, the contractor is entitled to compensation if it can prove that it did not concurrently cause the delay and if it can quantify its damages with reasonable certainty. *See* <u>Blinderman Const. Co., Inc. V. U.S.</u>, 39 Fed. Cl. 529, 583 (1997), *aff'd* 178 F.3d 1307

16

(Fed. Cir. 1998)(opining that the contractor as plaintiff has the burden of proving "every essential element of a compensable delay"). When liability is established, the Contractor has to prove its damages to a "reasonable certainty".  See Wunderlich Contracting Co. v. U. S., 173 Ct. Cl. 180, 351 F.2d 956 (1965)("A claimant need not prove his damages with absolute certainty or mathematical exactitude… It is sufficient if he furnishes the court with a reasonable basis for his computation …"); John E. Green Plumbing and Heating Co., Inc. v. Turner Const. Co., 742 F.2d 965, 968 (6th Cir. 1984) ("the law does not require impossibilities when it comes to proof of damages, but it does require whatever degree of certainty that the nature of the case admits. A damage award must not be based on mere speculation, guess or conjecture.").

In the present case, RCC has persuaded the Court that the Authority had sole control over the activities that delayed the project, entitling it to additional compensation for the delays in the performance of the work.  The extension of time suffered in the Desvío Sur de Patillas project is not normal for this type of project. (Tr. of 2/15/07, p. 761).  The Court concludes that RCC has demonstrated an entitlement to compensation for delay damages based on the governing contractual provisions between the parties.  The delay was excusable, the delay was compensable and RCC demonstrated the quantum of the resulting damages.  PRHA also admitted in its

17

answer to the complaint that it owes RCC something for this project, but did not specify what it owed.

RCC seeks compensation for extended overhead costs for a total of 471 days of delay. RCC calculated this delay period by adding up the number of days from March 1, 1993 (the original completion date) to July, 1994. However, the evidence showed that substantial completion of the Project was achieved on March 18, 1994 (See Exhibit No. 9). Pursuant to the contract, the project is substantially completed when all the contract work, except for few very minor details, has been completed. See Blue Book § 108.08(e). After the project was substantially completed there is no further delay analysis because the only tasks to complete are the minor items, punch list items or finishes which are not critical for the completion of the project. Hence, the Court concludes that RCC is unable to claim overhead expenses due to delay from March 18, 1994 to July 1994, which represents a difference of 89 calendar days.

On February 27, 1995, PRHA issued its final inspection report (Joint Ex 12) acknowledging that the contract was performed in accordance to the requirements, thereof, within the time period authorized, and recommending that the project be officially accepted. (Tr. of 2/15/07, pp. 785-790). Also on February 27, 1995, PRHA's Director of Construction, Eng. Irving Ocasio, wrote to Eng. Reynolds in relation to the extended job and main office overhead, stating that such request had been referred to PRHA's finance area for

18

auditing and that the claim for the "under-run" of the piles had been referred to PRHA's Sub-Regional Office, indicating that once the recommendations were received, RCC would be called for a meeting to discuss the same. That meeting never took place. (RCC's Ex 13; Tr. of 2/15/06, pp. 792-794). On April 7, 1995, Dr. González, referring to the final inspection of April 14, 1994, stated that the project was found in conformance with the conditions of the contract and as such, accepted the same, conditioned to its final liquidation pursuant to Section 109.09 of the General Conditions of the contract, indicating March 18, 1994 as the termination date. (RCC's Ex 14) (Tr. of 2/15/06, pp. 795-796).

On that same date, Dr. González notified the Department of Transportation of Puerto Rico that the Desvío Sur de Patillas project had been completed in accordance to the plans and specifications and requested that the project be included within the highway network under conservation by the Department of Transportation. (RCC's Ex 15; Tr. of 2/15/06, pp. 796-799). On August 16, 2001, Eng. Reynolds wrote to PRHA's Area Director of Construction, requesting a status report on RCC's claim, which was never answered. (RCC's Ex 16; Tr. of 2/15/06, pp. 800-801).

The Court rejects PRHTA's allegation that RCC did not present it claim to the Authority until over ten months after the final completion. RCC notified PRHA of the problem, that its was affecting RCC's costs, based on the conditions of the site, which could not be

19

predetermined prior to performing the activity, that the construction was being adversely impacted and that at the end of the activity or the assessment, RCC would be submitting a request for payment.  This was done through letters, conversations, weekly meetings, and discussions held at the project, in the normal course of the construction.  PRHA had resident engineers at the Desvío Sur de Patillas project at all times.  (Tr. of 2/26/07 p. 1151-1155).  As a matter of fact, the payment for the driving of the piles was made according to the records of PRHA's inspector. (Tr. of 2/26/07, pp. 1155-1156).

During the weekly construction meetings at both the Desvío Sur de Patillas project and Dorado-Toa Alta projects, Eng. Reynolds was present, with the project manager, the project engineers from RCC, PRHA's inspectors and its resident managers, and all the items related to the projects were discussed.  At those meetings, the problems as to the two projects were brought to the attention of PRHA.   (Tr. of 2/26/07, pp. 1156-1157).   In addition, special meetings were held to discuss the problems.  RCC would also call extraordinary meetings to address them.  (Tr. of 2/26/07, pp. 1157-1158).  Eng. Reynolds submitted a request for payment of the piles and a formal claim, when he sent the letter requesting the compensation.  (RCC's EXs 10 and 11; Tr. of 2/26/07, pp. 1165-1166).

PRHA has not made any payment to RCC as to its claim for the Desvío Sur de Patillas project (Tr. of 2/27/07, p. 1482).  The Court

concludes that RCC is entitled to office and job overhead of $632,187.87, less the credit of $81,218.53, plus $34,072.27 for the under-run of the piles and joints, for a total of $585,041.61, plus 10% profit of $58,504.16, for a total of $643,545.77, plus prejudgment interest at 6.5% from February 27, 2007.

**AC-20009 ("PR 2 Mayagüez"), Adversary No. 03-0194**

PRHA awarded this project to RCC for the construction of geometric improvements and additional lanes on 7.23 kilometers of Road 2 from Mayagüez Terrace to PR 100. The PR-2 Mayagüez project included the relocation of existing utilities such as pluvial, sewer and electronic systems, and the installation of underground electric systems for lighting in primary lanes and synchronized traffic lights at seventeen intersections. (Tr. of 2/12/07, pp. 31-32, 45). The project commenced on April 30, 1990, as provided for in PRHA's order to proceed dated April 18, 1990. The original completion date was October 21, 1991, for an original contract price of $14,750,000.00, and a contract time of 540 days. RCC substantially completed the project on November 1, 1993, with an actual completion date of June 30, 1994. Nonetheless, RCC did additional work at the project until May 31, 1995. While the construction work went on, the pavement was in use at all times, at least partially. (Tr. of 2/14/07, p. 644).

Throughout the project, RCC encountered (i) that the technical plans and specifications prepared by PRHA were incomplete and contained errors; (ii) that the technical information provided by PRHA was

insufficient to estimate and perform the necessary work; (iii) that the original design by PRHA did not comply with the requirements and regulations of public agencies of the Commonwealth of Puerto Rico and was defective for the electrical work to be performed; (iv) the existence of unidentified elements and structures in the contract documents prepared by PRHA and of conditions in the terrain different from those indicated by PRHA, including the deplorable condition of the concrete slabs, and that due to the poor quality of the material below the asphalt, it could not be used in other sections, as provided for in the contract specifications. The material had to be discarded and other material had to be brought in (borrowed) from other sources; (v) numerous changes of sequence in the execution of the work all over the seven kilometers of the project, causing inefficiency throughout the time of the project, due to circumstances that could not be foreseen, among others, different site conditions; (vi) undue delays by PRHA in the resolution of the different problems and issues, such as design and other technical aspects; and (vii) delays in the disbursement of payments under the contract by PRHA, contrary to what was agreed to. (Joint EXs 11, 19, 23, and 41; RCC's EXs 4, 5, 6, 12, 13, 14, 15, 18, 20, 22, 24, 47 and 59) (Tr. of 2/12/07, pp. 129-130, 143-148, 179, 185-188, 193-200, 234-240, 329; Tr. of 2/13/07, pp. 234-240, 395-398;Tr. of 2/14/07, pp. 513-514, 520-530, 553-554, 596, 604, 632, 659-660; Tr. of 7/2/07, pp. 44-48).

As in the other projects, the Court rejects PRHA's contention that RCC has failed to establish a differing site conditions claim.

PRHA admits that Miguel Redondo personally performed a general investigation of the road and its surroundings during one day, but claims that it was insufficient as due diligence. In spite of experience, RCC could have spent a number of days investigating and not determined the poor quality of the material below the asphalt.

The required change orders and extra work orders were of such magnitude that PRHA agreed to extensions of almost three times or 300% the original contract time. In Arq. Redondo's more than thirty years of experience in construction, he indicated that the PR-2 Mayagüez project was the first time where the term of a contract was extended in such a fashion.

The project was designed in conjunction with Dr. González as to the traffic signal system, who at the time was a professor at the University of Puerto Rico's Mayagüez Campus and later, during the performance of the contract, became PRHA's Executive Director, remaining as such during the time Continental Lord, Inc. ("Lord") did electrical work at the project, as RCC's electrical subcontractor, until May 1994. (Tr. of 2/13/07, pp. 395-398; Tr. of 2/2/6/07, pp. 1188-1190).

Eng. Julio Feliciano ("Feliciano"), PRHA's resident engineer, acknowledged the deficiencies and problems that RCC and Lord were encountering in the performance of their contracts. (EXs 11, 12, and 19) (Tr. of 2/12/07, pp. 201-205, 240-242; Tr. of 2/13/07, pp. 249-252; Tr. of 2/14/07, pp. 584-585). Eng. Montero spoke about the

problems with PRHA's resident engineers and thereafter, a letter was addressed to PRHA. He also broached the issues during RCC's weekly meetings with PRHA. (Tr. of 2/14/07, pp. 587, 594-597).

PRHA was notified of RCC's claims, as recognized by the change orders and extra work orders issued by PRHA. Eng. Mercado, Lord's project manager, participated in the weekly meetings with PRHA, during which RCC indicated to PRHA's representatives its intention of presenting its formal claim, which could not be presented until the conclusion of Lord's electrical work. (Tr. of 2/14/07, pp. 565-638-640; Tr. of 2/26/07, p. 1263). Through a letter dated December 6, 2000, RCC presented its formal claim to PRHA. (Joint EXs 9, 25, 26, 27, 28, 30, 37, 38, and 41; RCC's EXs 4, 5, 6, and 12) (Tr. of 2/12/07, pp. 77-79, 127-129, 135-136, 141-142, 150-152; Tr. of 2/13/07, pp. 388-391, Tr. of 2/14/07, pp. 513-514, 520-530, 553-554, 561, 581-582).

Lord was responsible for the installation of the lighting systems at the project, including the installation of a thirteen traffic signal system at intersections and new highway lighting along the project. There were also some pedestrian amenities that had electrical facilities to be done by Lord. Eng. Mercado, as Lord's project manager, coordinated with RCC the electrical work to be performed. He participated in meetings with PRHA to coordinate therewith, on behalf of RCC. Eng. Mercado was in contact with the

24

project on a day to day basis and visited the project twice or more per week. (Tr. of 2/26/07, pp. 1182-1185, 1188).

Part of Lord's job was to coordinate with the Puerto Rico Electric Power Authority ("PREPA") the construction of a new power line that would align with the project in order for RCC to be able to proceed with its work. (Tr. of 2/26/07, pp. 1186-1187). Lord encountered hundreds of problems and major design issues. Lord's claim, RCC's EX 68, prepared by Eng. Mercado, includes a discussion of the problems faced by Lord in performing its contract and the evidence in support thereof. (Tr. of 2/26/07, pp. 1191-1202, 1243-1244, 1249; Tr. of 2/14/06, pp. 632, 658).

Due to errors in the design of the pull boxes, part of the electrical system, and PRHA's delay in correcting the errors, Lord's work was delayed approximately 453 calendar days. These are the days that transpired from the time the problem was presented by Lord to PRHA, until PRHA's approval of the extra work order to correct it. (Tr. of 2/26/07, pp. 1202-1203; 1205-1209, 1215; Tr. of 7/2/07, pp. 36-37).

The design of the master control room area, where the central computer for the control power system is located, with an emergency generator, for the power and data communication distribution to the thirteen traffic signal system at intersections, was incomplete and a redesigning was necessary since the designed location was insufficient and existing utilities prevented RCC from doing its

work, in order for Lord to be able to do its own. PRHA took 980 calendar days since Lord's notification to do the required redesign. PRHA was notified during the project meetings and in writing, even at its central office, of this matter. (Tr. of 2/26/07, pp. 1209-1215).

The design for the electrical facilities for the pedestrian amenities designated by PRHA in its drawings as A-1 and A-3,[6] which included a fountain and some light poles, lacked the details necessary for Lord to do the work. Lord requested that PRHA complete the electrical design, since there was no electrical distribution for the electrical devices. This was also brought to the attention of PRHA during meetings with its representatives, as in the case of the other problems. It took PRHA 668 calendar days to perform the required design and issue the necessary extra work and change orders for the work to be done. RCC's EX 68) (Tr. of 2/26/07, pp. 1216-1221).

RCC's EX 68 also describes the problems encountered by Lord as to the power and communication distribution for the thirteen traffic signal system, as to which Lord did not have a complete design to perform the work, since the drawing provided by PRHA did not show how the circuits were to be distributed along the thirteen intersections, nor the communication cable. This was also communicated to PRHA. It took PRHA 277 calendar days to correct the deficiency and provide Lord with the required information. (Tr. of 2/26/07, pp. 1221-1224).

---

[6] The master control room area is located in the area designated as A-3.

26

The last major problem encountered by Lord had to do with the traffic signal poles. When their installation commenced, trucks with sugarcane started to smash the traffic lights and PRHA required Lord to increase their height. As in the case of the other designs, these poles were designed by the team headed by Dr. González. (RCC's EX 68) (Tr. of 2/26/07, pp. 1224-1225; Tr. of 7/2/07, pp. 36-37). In discussing this problem with PRHA's representatives, PRHA decided to increase the height of the base of the poles, but Dr. González, by then PRHA's executive director, visited the project site, did not like the solution due to the aesthetics and instructed the removal of the poles, the demolition of the bases and the ordering of new, higher pole shafts. It took PRHA 717 calendar days to approve the final solution to this last major problem. Lord was directed to stop its work as to this activity when the problem arose until it was solved. (Tr. of 2/26/07, pp. 1225-1228, 1256).

The problems encountered by Lord impacted its original project schedule by 940 days. (RCC's EX 68) (Tr. of 2/26/07, pp. 1228-1229). The sequence of Lord's work was affected by these major problems, forcing Lord to have to move from one location to another, which also affected RCC, since RCC could not complete the work in particular areas until Lord finished its work. (RCC's EX 68) (Tr. of 2/26/07, pp. 1229-1237).

The original completion date for Lord's work was October 10, 1991, and due to the delays caused by PRHA, Lord had to remain at the project until May 15, 1994. (RCC's EX 68) (Tr. of 2/26/07, pp. 1238-1239).

27

RCC's EX 68 contains the cost analysis of Lord's claim done by Eng. Mercado with the assistance of Lord's comptroller, showing a claim totaling $1,746,085.00.  RCC's EX 68 includes extended general home office overhead, extended job overhead, additional labor costs due to loss of productivity, extended overhead for miscellaneous tools and expenses for inflation of miscellaneous materials, other expenses, and a profit factor of 15%.  In computing the extended general and home office overhead, Eng. Mercado also used the Eichleay formula.  (Tr. of 2/26/07, pp. 1238-1242, 1266).  As stated by Eng. Mercado, Lord had never encountered, either before or after the Mayagüez project, the amount of delays and problems it had to face in the PR-2 Mayagüez project.  (Tr. of 2/26/07, p. 1243).

Eng. Díaz, the president of Remodelco, Inc. ("Remodelco"), RCC's subcontractor for special type concrete sidewalks and special purpose recreational areas called "amenities," work that was to be accomplished as RCC was doing the construction of the road, submitted Remodelco's $85,000.00 claim for extended overhead to RCC, resulting from the delays, design errors, and delays in decision-making attributable to PRHA, and the ensuing additional work that Remodelco had to do.  (Tr. of 7/2/07, pp. 12-15, 17-20).

The Court finds that PRHA was aware of the problems in the PR-2 Mayagüez project.  The problems were brought to the attention of PRHA throughout the project, area by area, by Eng. Montero to Eng. Feliciano.  In doing so, RCC reserved its right to claim indirect costs not contemplated by the change orders and extra work orders initiated,

approved and authorized by PRHA, resulting from delays beyond RCC's control. Eng. Delgado, PRHA's Regional Director for the Mayaguez Area during 1999-2000 and supervisor of the PR-2 Mayaguez project since 2001, referred to the project as complicated (Tr. of 2/28/07, pp. 6-7; 11-13; 69) and recognized the difficulties encountered by RCC. (Joint EXs 11, 19, and 23; RCC's EXs 13, 14, 22, and 24) (Tr. of 2/12/07, pp. 201-205, 211-216, 240-242; Tr. of 2/13/07, pp. 225-234, 252-264, 393, 398; Tr. of 7/2/07, p. 40).

Since early in the PR-2 Mayagüez project, RCC apprised PRHA as to its claim for extended overhead. (RCC's EX 16). Mobilization costs of getting into and out of the project, monthly expenses of the project, project office, warehouse at site, and having an engineer at the project are part of the job-site overhead. (Joint EX 41) (Tr. of 2/13/07, pp. 267-268).

On November 26, 2006, Eng. Bras met with Eng. Jorge Redondo and Eng. Díaz Sáez, at the time PRHA's Director of Construction. Engs. Pérez and Delgado also participated. Eng. Pérez was by then PRHA's resident engineer in charge of liquidating the project. Eng. Pérez substituted Eng. Feliciano for the PR-2 Mayaguez project's administration. Eng. Delgado was Eng. Pérez's supervisor. The purpose of the meeting was for RCC to seek the payment of monies due for work performed, pursue liquidation of the job and present its claims caused by the delays and for extended overhead. (Tr. of 2/13/07, pp. 399-402; Tr. of 7/2/07, pp. 25-27; Tr. of 2/28/07, pp. 82-83).

At that time, with Eng. Pérez as the last administrator on behalf of PRHA for the PR-2 Mayagüez project, RCC's, Lord's and Remodelco's claims for inefficiency and extended overhead were again discussed and one more time, PRHA stated that these were matters to be dealt with at another level.  It was not for Eng. Pérez, appointed to work on the liquidation process, to enter into the matter due to PRHA's policy of dealing with those issues at another level, meaning PRHA's Executive Director or its Director of Construction Area.  (RCC's EXs 35 and 36)(Tr. of 7/2/07, pp. 25-27, 60-61, 69-73).

Upon receiving Joint EX 41 in the year 2001, Eng. Pérez was surprised that it had taken so much time to liquidate the PR-2 Mayagüez project, recognizing that the claims raised by RCC were just.  Eng. Pérez was also surprised that at the time of the trial, the project had still not been liquidated.  Eng. Delgado also recognized Exhibit 41 as RCC's formal claim, with the basis therefor, and that RCC also submitted another claim.  Eng. Delgado admitted that his contract with the PR-2 Mayaguez project began in 2001, approximately two years after PRHA's order to proceed and that he did not have personal knowledge as to what happened during those two previous years.  He also admitted that Eng. Montero and Eng. Feliciano, as the resident agent for PRHA, had differences in reference to the performance of the work and that there was animosity between them.  Eng. Delgado could deal with Eng. Montero, whom he considered to be a professional and a very competent worker. Eng. Feliciano was replaced by Eng. Pérez and contrary to the situation with Eng. Feliciano, Eng. Montero and Eng. Pérez did not have any

30

problems.  Eng. Delgado admitted that due to animosity between Engs. Feliciano and Montero, the information as to the problems in the project would flow mainly by correspondence, identifying one of the letters from Eng. Montero setting forth the different problems and alerting PRHA as to the consequential delay.  Eng. Delgado also recognized that during the meetings between RCC's and PRHA's representatives, the problems related to the construction work were discussed.  (Tr. of 7/2/07, pp. 31-33, 62-65, 78-82; Tr. of 2/28/07, pp. 11-13; 107-108; 115; 122-129; 125-127; 130).

In examining RCC's Exhibit 41, Eng. Delgado recognized that the letter sets forth that the change orders, extra work orders and other issues caused the time of performance of the contract to be increased from the original contract term of 540 calendar days to 1,878 days.  He admitted that there was a significant extension of time granted by PRHA to RCC.  He recognized RCC as a reliable and efficient contractor and that there were many change orders and extra work orders (Tr. of 2/28/07, pp. 135-136).

As evidenced by Joint EX 41, RCC's final claim, which includes a claim for extended overhead and inefficiency, there were multiple claims against PRHA arising from the PR-2 Mayagüez project.  Joint EX 41 was prepared by Eng. Bras, RCC's project manager, with the participation of RCC's claims consultant, Mr. Civitello, and Arq. Redondo, based on the number of days granted by PRHA, without considering any specific date as to the substantial completion of the project.  The claim goes into the specifics of the process that was followed in its preparation, has

a detailed analysis of the different items claimed, the basis therefore, and the effects of the change orders thereon. According to Eng. Montero, RCC's project engineer, and Eng. Bras, the signatory, Joint EX 41 is an accurate portrayal of what transpired at the project. (Joint EX 41) (Tr. of 2/12/07, pp. 372; Tr. of 2/13/07, pp. 402-407; Tr. of 2/14/07, pp. 152, 562, 635, 639-640; Tr. of 2/16/07, pp. 950-964, 976-977, 1002-1012, 1025-1035, 1044-1049).

Lord's and Remodelco's claims against RCC are included in Joint EX 41, in accordance with Section 109.04 of the Blue Book. They are the only two subcontractors with claims. (EX 68) (Tr. of 2/14/07, pp. 658-659, 668-691; Tr. of 7/02/07, pp. 1242-1243). And while PRHA argues that it had no contractual relationship with Lord and Remodelco, these claims were direct costs of completing the project.

The PR-2 Mayagüez project had many disruptions. There were many factors that delayed the job, which resulted in additional work, through thirty-nine change orders for approximately $3M, and thirty-two extra work orders for around $2M. The change orders, with the additives and deductive items, included 196 activities. The extra work orders include ninety activities not contemplated in the original plans and specifications. The change orders and extra work orders did not occur in an organized sequence from one point to the other. They skipped around different areas of the project, causing inefficiency, which affected the work to be performed under the contract by RCC. The entire footprint of the project was affected by the change orders and the extra work orders, causing the extension of the contract until the substantial

32

completion on November 1, 1994, which added to the 540 original term, resulting in an additional 1,127 calendar days. Eng. Delgado recognized that the additional work that RCC was required to perform under its contract with PRHA was substantial. (Joint EX 41, RCC's EX 59) (Tr. of 2/12/07, pp. 62-63, 132, 143-147, 177-178; Tr. of 2/13/07, pp. 393-395; Tr. of 2/14/07, pp. 665-674; Tr. of 2/16/07, pp. 961-977, 1025-1035; Tr. of 7/2/07, pp. 27-28; Tr. of 2/28/07, p. 123).

The change orders were paid on the basis of unitary prices, the mechanism provided for in the contract by which line items are adjudicated by actual quantities. The extra work orders consisted of new items of work not contemplated within the scope of the contract. The change orders and extra work orders, which were prepared, approved, and executed by PRHA, resulted in a modification of the original contract and in an increase in the contract price from $14,750,000.00 to $19,828,959.00. Of this amount, RCC has been paid $18,071,303.83 by PRHA. (Tr. of 2/16/07, pp. 961-962, 976-977; Tr. of 7/2/07, p. 40).

The number of change orders and extra work orders is evidence of the disruption caused by the deficient drawings, the problems with utilities, different site conditions, as well as PRHA's delays in solving the problems. The degree of changes resulted in a different concept from what the contract originally intended, which affected the sequence of the work, causing inefficiency. (Joint EX 41; RCC's EX 19) (Tr. of 2/12/07, pp. 62-63; Tr. of 2/13/07, pp. 395-397; Tr. of 2/16/07, pp. 979-1035).

33

Joint EX 41 establishes that the actual conditions at the project were materially different from those anticipated by RCC when submitting its proposal as part of the bidding process, which under the contract, allowed RCC to revise the unit prices originally contemplated and modify them to more equitably reflect the actual conditions which were experienced. The change and extra work orders did not cover or take into consideration their effect in the unitary prices and the original costs of the contract, considered by RCC when submitting its proposal back in 1990. As a result of the extension of time and the extra work required to complete the project, RCC requested that PRHA pay extended overhead for the 1,338 additional days. (Tr. of 2/12/07, pp. 143-152).

During his deposition, Dr. González acknowledged his involvement in the project, that it was completed during his tenure as PRHA's Executive Director, that it took "twice" the contract time (actually, more than three times), that the extensions were not common, and that the time delays had monetary consequences in favor of RCC. Dr. González was aware of RCC's claim. (RCC's EX 64) (Tr. of 2/12/07, pp. 37-39, 40-41, 68-69).

While PRHA recognized the direct costs of the new items in the extra work orders and the change orders, it did not recognize the overhead expense resulting therefrom. PRHA only awarded time, indicating that overhead would be dealt with at the end of the project, in line with Dr. González' policy. To date, PRHA has not liquidated the project. (Tr. of 2/12/07, pp. 59, 136-139).

As testified by Eng. Bras in cross-examination, Joint EX 41 is a recollection of 5 years of the hazards, delays and problems that were job experienced.  He explained how the document was prepared.  (Tr. of 2/14/07, pp. 646-646, 654-658).  As project manager, Eng. Bras knew what was going on in the project and had daily contact with Eng. Montero. He visited the project once or twice per week.  (Tr. of 2/14/07, pp. 663, 665).

The Court concludes that RCC has proven the disruptions in the work performed and therefore established an entitlement to inefficiency claims against PRHA.  There was a reduction in the expected productivity of labor and equipment, which went well beyond the normal range of disruption inherent in the construction process. These delays were caused solely by compensable events within the control of PRHA.

By the end of 1993, the project was not accepted by Dr. González due to the fine-tuning of the traffic lighting system designed by him.  Dr. González required that RCC give up this part of the contract, which was deducted as a line item, and then awarded to Dr. González's company, while he was still PRHA's Executive Director. The back charge to the contract for this item resulted in a reduction in the contract price.  After the work was completed by the other company, Dr. González accepted the project as substantially completed.  (Joint EXs 25, 26, 27, and 30) (Tr. of 2/13/07, pp. 264-273).

In accepting the PR-2 Mayagüez project, Dr. González found it to be in compliance with the conditions of the contract, constructed in accordance with the plans and specifications, and reflecting no visible deficiencies. It was accepted, pending its final liquidation, in accordance with Section 109.08 of the Blue Book, liquidation which has not taken place, notwithstanding having been recommended by Eng. Delgado, after the acceptance of the project and its turning over to the Department of Transportation and Public Works of Puerto Rico. (Joint EXs 30 and 38; RCC's EXs 33 and 34) (Tr. of 2/13/07, pp. 275-276, 280-284, 307-309).

On October 4, 2001, RCC's prior counsel, Rebeca Barnés, Esq., wrote to Dr. Fernando Fagundo, then PRHA's Executive Director, in an attempt to obtain an answer regarding RCC's claim and commence arbitration. (Joint EX 41 and RCC's EX 42) (Tr. of 2/13/07, pp. 309-316). This effort was undertaken after Eng. Bras, on February 21, 2001, wrote to Dr. Luis Lluch, at the time PRHA's Executive Director, requesting an answer to the December 6, 2000 claim. (RCC's EX 43) (Tr. of 2/13/07, p. 316). Thereafter on October 31, 2001, in referring to RCC's demands for indirect expenses, inefficiency and other claims, PRHA repeated that RCC's claims would be dealt with at another level, while recognizing the problems. (RCC's EX 34(a)) (Tr. of 2/13/07, pp. 284-294).

Having received no response to Ms. Barnés' letter, on February 6, 2002, RCC again requested arbitration in accordance with Section 109.08

of the Blue Book.  (RCC's EX 44) (Tr. of 2/13/07, pp. 317-321).  On February 21, 2002, counsel for PRHA responded to the letter of February 6, 2002, stating that RCC could invoke arbitration within 30 days of notice of PRHA's final decision on RCC's claim, obviously accepting that PRHA had not decided the same, indicating that RCC's demand was being referred to investigation, more than seven years after the substantial completion of the project.  (Joint EX 45) (Tr. of  2/13/07, pp. 321-329).

RCC filed Case No. KAC 2002-1428 with the local courts, requesting arbitration.  In response, PRHA contested the request for arbitration because PRHA had still not decided RCC's claim under Section 109.08 of the Blue Book.  In its answer, PRHA recognized the submittal of RCC's claim (Joint EX 41) and sustained that RCC's cause of action arose from a contractual relationship as to which RCC had a fifteen-year term for the filing of its claim.  PRHA further recognized that RCC's claim (Joint EX 41) complied with the first requirement of Section 109.08 of the Blue Book, in order to proceed with arbitration, but claimed that since, as of the date of its answer, PRHA had not denied totally or partially, RCC's claim, RCC's complaint was premature because the second requirement for arbitration [the denial of the claim] had not been met.  PRHA indicated its intention of processing RCC's December 6, 2000 claim. (Joint EXs 41, 57 and 58)(Tr. of 2/13/07, pp. 336-350; Tr. of 2/14/07, pp. 510-512).

37

It was not until August 27, 1996, that the documents for the liquidation of the PR-2 Mayagüez project were turned over to Mr. Alamo.  (Joint EX 50)(Tr. of 2/12/07, pp. 92; Tr. of 7/2/07, pp. 58-60; Tr. of 7/2/07, p. 60).  Mr. Alamo admitted that all of RCC's claims to PRHA had been stayed and that he was aware of Joint EX 41. Furthermore, he indicated that the documents that had been turned over to him in August 27, 1996, by Eng. Pérez for the liquidation of the project had been lost, that he had to commence the liquidation process again in 2006, and that as of October 3, 2006, the final liquidation of the PR-2 Mayagüez project had not been finalized, in order for it to be turned over to PRHA's finance department.  Mr. Alamo testified that the computation he was in the process of completing, did not include the extension of time factor, which was to be done separately from the liquidation.  As did Eng. Pérez, Mr. Alamo acknowledged that what transpired as to the liquidation of the PR-2 Mayagüez project was not common or usual.  He could not recollect any other project that had not been liquidated in thirteen years, nor any other in which the liquidation documents had been lost and thirteen years later, had to be redone.  (Joint EX 50; RCC' EX 62) (Tr. of 7/2/07, pp. 41-44, 62-65, 78-82).

Mr. López, Director of PRHA's Pre-Intervention Office, acknowledged having in his records the letter as to the final inspection and acceptance of the PR-2 Mayagüez project (Joint EX 30) with a value of $19,041,517.09, of which $18,121,896.51 had been paid

as to work performed by RCC, and that for the final liquidation to come to his office, it had to be processed by the Construction Area with a final report, which had to go first to PRHA's Treasurer.  As to the issue of extended overhead, Mr. López stated that his office receives recommendations from the Construction Area and that he had not seen them in the case of the PR-2 Mayagüez project.  He stated that they were still waiting for the package to come from the Construction Area for the liquidation of the project.  Mr. López indicated that of all projects pending liquidation, PR-2 Mayagüez was the only one in which he was yet to receive the final certification from the Construction Area.  (RCC's EX 66).

Mr. Del Valle, PRHA's Treasurer, testified that he remembered seeing the final inspection and acceptance of the project letter in the file (Joint EX 30), and explained the procedure for the liquidation of the PR-2 Mayagüez project after its final acceptance, which is the delivery of the liquidation documents to the Construction Area for a Contract Final Report, which could not be found in the file, as he discussed on August 21, 2006.  The Contract Final Report is necessary for Mr. Del Valle's office to evaluate the same and refer it to the Pre-Intervention Office for the liquidation of the contract and payment. (RCC's EX 67).

Eng. Delgado testified that the PR-2 Mayaguez project had still not been liquidated on February 28, 2007 (the day of the hearing) that it had been over thirteen years since the substantial completion of the project and that he had not been involved in any other project

which took over thirteen years to be liquidated. (Tr. of 2/28/07, pp. 143-144). Eng. Delgado admitted that the granting of additional time to a contractor means that the contractor is entitled to compensation for those additional days and that a contractor incurs additional overhead expenses if the contract time is extended beyond the original contract date (Tr. of 2/28/07, pp. 149-152).

Notwithstanding RCC's demands for the amounts owed to it and its two subcontractors under the contract, PRHA to date, more than fifteen years after the substantial completion of the project, has not proceeded with its liquidation and as a consequence, has failed to pay RCC the items claimed to be due under the contract. (RCC's EXs 33, 34, 34A, 35, 36, 42, 43, and 44; Joint Exs. 27, 28, 30, 31, 41, 45, 56, 57, and 58) (Tr. of 2/12/07, pp. 62-63).

The original amount claimed by RCC as set forth in Joint EX 41 were corrected by Mr. Civitello as to certain mathematical errors, including the inefficiency factor, as reflected in RCC's EX 41(b) and EX 59. (RCC's EXs 4, 5, 6, 41-A, 41(b), 52, 59, and 69) (Tr. of 2/12/07, pp. 152-156, 157-168, 169-200, 359, 360-368; Tr. of 2/13/07, pp. 351-368; Tr. of 2/14/07, pp. 693-697; Tr. of 2/16/07, pp. 79-1001, 1013-1022, 1025-1035, 1044-1047, 1057-1068).

The Court finds that between the original completion date of October 21, 1991 and June 30, 1994, which the Court accepts as the true substantial completion date, there were 1003 days. The Court also finds that RCC's on site daily expenses were $1,882.06 and the

40

home office overhead was $1,071.16 per day (Ex. 41).   While PRHA argues that the elimination of the night shift, resulting in work that was supposed to be performed in two shifts being performed in only one, may have affected the contract time, PRHA has not presented any evidence to prove the percentage by which the time was arguably affected.   The elimination of the night shift was approved by PRHA and by the Federal Highway Administration.   The evidence was that the night shift was not productive and that the material being removed from one part of the project was inadequate for use in another, which caused the borrow material, which PRHA approved.   The Court also concludes that RCC did not concurrently cause the delays and has proven its damages with reasonable certainty.   Prejudgment interest will accrue from June 30, 1996, when RCC indicated that the final payment was due.

Accordingly, PRHA owes RCC the following amounts as to the PR-2 Mayagüez project:

| | |
|---|---|
| Construction Inefficiency (Contract + COs) | $1,767,742.33 |
| Equitable Adjustment for Extra Work Orders Due to Inefficiency | $  991,080.53 |
| Extra Work Orders:<br>    Miscellaneous Items  $126,594.79<br>    Type X Sidewalks     $180,000.00 | $  306,594.79 |
| Extended Time of Performance Overhead:<br><br>    On-site Costs        $1,887,706.18<br>    Home Office          $1,074,373.48 | $2,962,079.66 |
| Claims of Subcontractors:<br>    Lord                 $1,746,085.00 | $1,831,085.00 |

| | |
|---|---|
| Remodelco | $    85,000.00 |
| Total Equitable Adjustment | $7,858,582.31 |
| Profit 10% | $   785,858.23 |
| Payment due on original Contract | $1,757,659.12 |
| TOTAL | $10,402,099.66 |

## AC-01657 ("Dorado-Toa Alta"), Adversary No. 03-0195

On September 23, 1998, the contract for the Dorado-Toa Alta project was executed between RCC and PRHA.  (RCC's EX. 1) (Tr. of 2/15/06, pp. 801-802).  The contract included plans for a bridge to be constructed across La Plata River and had four piers and two abutments.  RCC had to build a bridge on a short approach connecting Road 165 from Toa Alta to Dorado, PR.  (Tr. of 2/15/06, pp. 802-03). Eng. Reynolds was in charge of this project.  He was the project manager for RCC and was also directly involved in the field.  (Tr. of 2/15/06, p. 804).

On September 23, 1993, PRHA issued to RCC the notice to proceed with the project by no later than October 4, 1993, with a total term of 540 calendar days and an original completion date of March 27, 1995.  (RCC's EX. 11) (Tr. of 2/15/06, pp. 804-805).  On October 4, 1993, RCC commenced the project.

On May 31, 2001, PRHA issued the final report for the final inspection as to the Dorado-Toa Alta project, with the original amount of the contract as $2657,000.00, and a final value of $3,063,042.54.  The report indicated that the final inspection was

42

undertaken on October 26, 1995, and that the project was found according to specifications with a completion date of September 5, 1995.  (RCC's EX. 12)(Joint Ex. 14) (Tr. of 2/15/06, pp. 805-809).

Also on May 31, 2001, PRHA notified the Department of Transportation of Puerto Rico that the project had been completed and inspected, and that it should be included in the Department of Transportation's network for maintenance purposes.  (RCC's EX 13) (Tr. of 2/15/06, pp. 806-807).

During the construction of the project, RCC found several problems that altered the character of the work that RCC anticipated. At the beginning, rock excavation was found instead of the regular excavation that was expected.  During the construction of Pier 3, RCC had to build a foundation that included pile driving because RCC had a major de-watering problem in building the pier at the site.  (Tr. of 2/15/06, pp. 810-811).  The problem impacted the project in terms of costs and time, increasing both.  None of the problems were attributable to RCC (Tr. of 2/15/06, p. 811).  They were considered differing site conditions, attributable to the owner, PRHA.  (Tr. of 2/15/06, p. 811).  As of November 1994, there was zero completion of work at Pier 3 because of the water problem.  (Tr. of 2/15/06, p. 817).  In its answer to the adversary complaint, PRHA alleges that RCC is not entitled to any damages for delays, if any, since government caused delay was foreseeable and due to RCC's experience

43

in the industry, its effects should have been included in the contract price.

In referring to the cost report for the Dorado-Toa Alta project, Eng. Reynolds indicated that through it, all costs related to the project, as to each item, are tracked. The de-watering problem as to Pier 3 is reflected in the cost report by the costs incurred in reference to Pier 3. The cost report relates to RCC's EX 16. This exhibit tracks time and the cost report, the costs. RCC's EX 16 shows the delay (RCC's EX 2) (Tr. of 2/15/06, pp. 822-831). RCC's EX 10 shows a loss for the excavation of Pier 3 of $122,802.55 and as to problems with the excavation of Pier 3, $334,752.56. (RCC's EX 10) (Tr. of 2/15/06, pp. 834-837).

Eng. Reynolds explained how, by the use of tremi-seal, which is like a plug, the application of a concrete layer of two or three feet of concrete, when there is a lot of water, is used in order to be able to de-water and build the footing and the columns, and other items. (Tr. of 2/15/06, pp. 851-852). In view of the water problem at Pier 3, it was decided to change the elevation of the footing, for which leave from the Corps of Engineers had to be obtained, due to its flood control program. (RCC's EX. 20) (Tr. of 2/15/06, pp. 853-857). On March 13, 2005, Eng. Reynolds wrote to Eng. Gonzalo Aponte ("Aponte"), supervisor for PRHA, Manatí Region, submitting the re-design of Pier 3 to get approval therefore, which was obtained. (RCC's EX. 22) (Tr. of 2/15/06, pp. 857-861). On March 20, 1995,

44

Eng. Reynolds wrote to Eng. Aponte requesting payment for the tremi-seal concrete placed at the bottom of the footing installed at Pier 3, referring to four different sections of the contract that justify the payment, totaling $30,229.00. This amount has not been paid to RCC. (RCC's EX. 26) (Tr. of 2/15/06, pp. 865-867).

Eng. Reynolds wrote to RCC's consultant, Mr. Gale Green, who helped RCC deal with the Corps of Engineers providing him with information as to the problems encountered as to Pier 3. (RCC's EX. 25) (Tr. of 2/15/06, pp. 854-855, 867-870). On March 31, 2005, Eng. Reynolds wrote to Eng. Víctor Pellicier, attaching the acceptance of the Corps of Engineers to the concept proposed for the solution to the problem at Pier 3. It was sent to Eng. Pellicier in his capacity as engineer of record. (RCC's EX. 27) (Tr. of 2/15/06, pp. 87-876). Through the correspondence of March 31, 1995 (RCC's EX. 27), Eng. Reynolds sent to Eng. Pellicier the acknowledgment of the Corps of Engineers, that it had no problem with the modifications proposed by RCC to Pier 3, relative to the adjustment in elevation, which was necessary for RCC to do the work. (Tr. of 2/15/06, p. 876).

On May 10, 1995, Eng. Héctor Ortega, resident engineer for PRHA, wrote to Eng. Reynolds requesting that he provide the revised construction schedule to complete the activities for the construction of the project and for RCC to request additional time due to the problems and the changes required at Pier 3. (RCC's EX. 28) (Tr. of 2/15/06, pp. 876-878). Because the Dorado-Toa Alta project was a

45

federally-funded project, the approval for the changes in elevation of the footing at Pier 3 also had to be obtained from the Federal Highway Authority.  (RCC's EX. 29) (Tr. of 2/15/06, pp. 878-882).

On May 22, 1995, Eng. Reynolds wrote to Eng. Aponte, regional supervisor of the Dorado-Toa Alta project, submitting as an attachment the impacted schedule to complete the work that was left, as requested by PRHA, reflecting the actual conditions as of that date.  The same involved and included the impact caused to the project by the different site conditions at Pier 3.  The faxed letter refers to de-watering, the sheet piling, the re-design of the footing, the construction of Pier 3, and the impacted schedule, included as an attachment, reflects the incorporation of all the revised dates and elements as to what happened in relation to Pier 3, showing an extended date of September 12, 1995.  (RCC's EX. 30) (Tr. of 2/15/06, pp. 886-889).

An internal document of PRHA dated May 24, 2005, signed by Eng. Ocasio and Eng. José Hernández, PRHA's director of design, consisting of a memorandum, attaches the letter from the Federal Highway Authority.  (RCC's EXs 29 and 31) (Tr. of 2/15/06, pp. 889-890). Eng. Reynolds was involved with the Dorado-Toa Alta project since the bidding process.  He was the full time project manager and became the project engineer of the Dorado-Toa Alta project for the purpose of solving the problems that RCC encountered. (Tr. 2/26/07, pp. 1104-1105).  Eng. Reynolds had a lot of experience in building bridges

46

over river beds. He was involved in the construction of the largest bridge in Puerto Rico on PR-22 Highway between Barceloneta and Manatí. (Tr. of 2/26/07, pp. 1104-1105; 1157-1159). After explaining the method of construction and the determination of the equipment to be used in a project of the nature of the Dorado-Toa Alta project, Eng. Reynolds concluded that this project consisted of a very basic bridge design. (Tr. of 2/26/07, pp. 1106-1107).

Eng. Reynolds described the type of protection to the excavation which is used when working close to a river, indicating that a coffer dam would normally be used and that some box protection could be utilized. RCC considered using two large steel boxes to protect the excavation from caving in when doing the installation of the piles. (Tr. of 2/26/07, p. 1108). Being a standard bridge, RCC expected to find some water in the river area. (Tr. of 2/26/07, p. 1109). However, RCC found conditions different from those under which it submitted its proposal. RCC expected to build a metal coffer dam to protect the excavation from cave-ins and had a water control pump available to take care of casual water, rain water or some minor water that would come into the excavation. Nevertheless, what RCC found at Pier 3 was basically an underground river plunging into the excavation. (Tr. of 2/26/07, p. 1110). RCC's EXs 33A, 33 B and 33E when compared with RCC's EX 33C, illustrate the dry conditions of Pier 1, 2 and 4, when compared with the water table found at Pier 3.

47

RCC's EX 33D shows RCC's involvement in the project and the extensive equipment that was required.

The condition found at Pier 3 caused a change in the construction method, since a tremi concrete seal had to be applied to the bottom of the excavation in the coffer dam after driving the piles at Pier 3, in order to try to seal the bottom of the excavation so that the water would not come in from the bottom. RCC was required to drain the piles from the water, apply the concrete seal, use drain pumps to take the water out and build Pier 3. (Tr. of 2/26/07, pp. 1111-1113).

For the construction of the coffer dam, RCC used two systems: a box built out of steel beams, steel sheets and one-quarter-inch plys of steel welded together, setting it with a crane, and in addition, RCC placed sheet piles around the box, which are the elements in RCC's EX 33C around the box, creating a double system for the excavation. The sheet piles were driven with a crane and a vibratory hammer. This is illustrated in RCC's EXs 33J and 33K, which also show the coffer dam. The frame is the top of the box. RCC's EX 33G shows the frame and skin with the steel structure (Tr. of 2/26/07, pp.1124-1133; 1159-1160). RCC's EXs 33L and 33N show the change in the sequence and logistics of the work that was necessary due to the different site condition found at Pier 3. These photographs were taken between July and August 1994. (Tr. of 2/26/07, p. 1171).

48

The condition found at Pier 3 was not contemplated.  Once the situation was under control, RCC forwarded RCC's EX. 19 on January 19, 1995, to PRHA as to RCC's intention to file a claim.  Before the letter, there were a number of conversations about the water problem with PRHA's representatives. (RCC's EX 19, 22, 25, 26, 30 and 39) (Tr. of 2/26/07, pp. 1134-1135).  Because there were several notices of the problem to PRHA, the Court rejects its contention that it was presented with RCC's original claim approximately two years and three months after the commencement of the project.

PRHA was aware of the problem (RCC's EX 28, 30, 31, 34, 35 and 39). Eng. Reynolds participated in the analysis of the claim with Arq. Redondo.  The claim was prepared after the notices to PRHA. (Tr. of 2/21/07, pp. 1144-1145).  RCC's EX 26 is a letter dated March 20, 1995, which is part of the claim for the tremi concrete.  There were also the additional costs incurred in the construction of Pier 3.  (Tr. of 2/26/07, pp.1145-1146).

RCC's EX 16, the progress schedule for the Dorado-Toa Alta project, shows that the water problem commenced around July 26, 1994, and concluded on August 16, 1994. (Tr. of 2/26/07, pp. 1114-1117). RCC's EX 33C is a photograph of Pier 3, in which on the left corner, one of the pumps can be seen.  The pumps were under water.  The photograph shows water and was taken before the pump system was installed.  (Tr. of 2/26/07, pp. 1117-1119).

49

PRHA provided the information as to the Dorado-Toa Alta project. (Tr. of 2/26/07, p. 1162). And to be competitive, RCC relied on the information provided by PRHA. As stated by Eng. Reynolds, construction projects are live projects. When there is a problem, the owner is notified, but at that point the contractor does not know whether there is a claim yet. Therefore, during the construction meetings, the owner, PRHA, was notified, made aware of the problems that RCC was facing during the construction of the project. (Tr. of 2/26/07, pp. 1163-1164; 1172).

Eng. Reynolds met with Eng. García, from GeoCim, Inc., and gave him the information about the water problem, the plans and probably some photographs. (Tr. of 2/26/07, p. 1148). The problems were not reflected in the change orders or extra work orders. (Tr. of 2/26/07, p. 1149). Eng. García, Geotechnical Engineer, testified as principal of GeoCim, Inc., which provides geotechnical engineering services, including engineering, testing and subsoil exploration. Geotechnical services is the branch of civil engineering in the area that has to do with the ground, earth, or rocks and the engineering problems related to this aspect of the natural soil and earth materials. (Tr. of 2/26/07, pp. 1317-1329).

Eng. García was engaged by RCC for the Dorado-Toa Alta project as a consultant to evaluate the situation which RCC encountered. RCC asked Eng. García to evaluate what he could estimate in terms of de-watering requirements, based on the information that was available at

50

the time of the bidding on the project, as opposed to what RCC was experiencing. (Tr. of 2/26/07, pp.1330-1333).

Eng. García was provided with construction drawings, a geotechnical report by Suelos, Inc., prepared for the firm that designed the bridge for PRHA, photographs to illustrate conditions during construction at the site, sketches of the coffer dam built by RCC, information as to the pumps used by RCC and reports from field inspectors that documented the use of pumps at the time. (Tr. of 2/26/07, pp. 1337-1348; 1352; 1354; 1396-1398). He concluded that what was experienced by RCC as to the flow of water at Pier 3 was three and a quarter times more than what was to be expected. (RCC's EX. 37, Tr. of 2/26/07, pp. 1348). Among other things, Eng. García used the daily reports for the project during the construction work at Pier 3 generated by an inspector for PRHA. These were the reports that indicated the number of pumps in use during that time. (RCC's EX. 39, Tr. of 2/26/07, pp.1396-1398).

Eng. García's opined that he would have estimated 170,000 to 230,000 gallons of water per hour for the lowering of the ground water level inside the coffer dam to maintain it fairly dry for construction of Pier 3. The actual volume of water found by RCC at Pier 3 was 655,000 gallons per hour. That is approximately 3.27 times more than Eng. García's estimate. (RCC's Ex. 37, Tr. of 2/26/07, pp. 1352-1353). Eng. García concluded that it was not reasonable for a contractor to have three times the flow of water

51

expected to be found in the Dorado-Toa Alta project at Pier 3. (RCC's EX. 37, Tr. of 2/26/07, pp. 1418-1419).

As to the Dorado-Toa Alta project, Arq. Redondo was in charge of the bid and as part of his regular duties went to the project at least once a week. (Tr. of 2/26/07, p. 1483). As indicated by Eng. Reynolds, RCC encountered one main problem, that of Pier 3, where a differing site condition was found, due to the amount of water that came from the ground. It was of such quantity that it could not be controlled, until RCC poured concrete Class A, with the water inside the coffer dam, as provided for in the contract if they encountered that type of situation, that is, making a concrete mat to stop the leakage of water from below the foundation. This is a concrete foundation seal (tremi-seal). (RCC's EX. 22, Tr. 2/26/07, pp. 1483-1484). Once the tremi-seal was in place, RCC was able to handle the amount of water (Tr. 2/26/07, p.1518).

The Blue Book specifies the use of a coffer dam and that type of seal, as well as the method of payment of concrete Class A, as set forth in Sections 206.04 and 601.315. (Tr. of 2/26/07, p. 1484).

RCC had seven pumps in a simultaneous 24-hour operation at the project to control the water seepage and even with the seven pumps RCC was not able to lower the water level until the tremi-seal was installed. (Tr. of 2/26/07, pp. 114-117; 1486).

RCC was eventually able to complete the Dorado-Toa Alta project and has a claim in reference thereto, due to the differing site

condition, which disrupted the entire project. (Tr. of 2/26/07, pp. 1484-1486). In RCC's EX 41, PRHA acknowledges that RCC had been unable to empty the excavation at Pier 3, "a fact that should worry not only the contractor but us at the agency." (Tr. of 2/26/07, pp.1510-1511).

The Court concludes that the water problem encountered by RCC at Pier 3 existed at the time of contracting and was materially different from the conditions expected or reasonably anticipated. Based on the testimony, the conditions encountered were reasonably unforeseeable and caused RCC's damages. Only one of the four piers had the water problem, which required elevation of footing, tremi seal concrete, approval of government agencies for the modifications and pumps to drain the water. As admitted by PRHA, public contracts expressly establish a different site conditions clause, which allows for equitable adjustment of time and money for contract conditions encountered at a site that vary materially from those indicated in the contract documents. Likewise, a contractor can be compensated for conditions that vary materially from those ordinarily encountered on a project site.

As to RCC's claim for the Dorado-Toa Alta project, the Court will allow:

| | |
|---|---|
| Extended main office overhead | $ 23,814.00 |
| Extended job site overhead | $125,064.00 |
| Total Extended overhead | $148,878.00 |
| | |
| Cost of additional work (Inefficiency) | $596,233.44 |
| Final Progress payment | $ 15,092.24 |

| | |
|---|---|
| Liquidated damages | $ 33,600.00 |
| Sub-Total | $793,803.68 |
| Profit factor 15% | $119,070.55 |
| TOTAL | $912,874.23 |

The Court will also allow interest at 6.5% per annum from October 26, 1995 until judgment.  (RCC's EXs 3; 36; 46; 47, Tr. of 2/26/07, pp. 1488-1492; 1493-149; 1504-1505; 1507; Tr. of 2/28/07, pp. 1277-1278; 1281-1294; 1297-1298).  The Court will not allow the $32,483.41 sought by RCC for the payment of insurance and bonds, as RCC failed to offer into evidence a copy of the insurance endorsement or proof of payment.

ORDER

WHEREFORE IT IS ORDERED that in Adv. 03-0192, the Puerto Rico Highway and Transportation Authority is liable to Redondo Construction Corporation in the amount of $713,338.03, plus prejudgment interest at 6.5% from February 27, 2007.

IT IS FURTHER ORDERED that in Adv. 03-0194, the Puerto Rico Highway and Transportation Authority is liable to Redondo Construction Corporation in the amount of $10,402,099.66, plus prejudgment interest at 6.5% from June 30, 1996.

IT IS FURTHER ORDERED that in Adv. 03-0195, the Puerto Rico Highway and Transportation Authority is liable to Redondo Construction Corporation in the amount of $912,874.23, plus prejudgment interest at 6.5% from October 26, 1995.

Each party shall bear their own costs and expenses.

Judgment will enter accordingly.

SO ORDERED.

San Juan, Puerto Rico, this 31st day of August, 2009.

BY THE COURT:

s/ Gerardo A. Carlo

_____
GERARDO A. CARLO
U.S. Bankruptcy Judge